UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT LONDON

| | |
|---|---|
| WILLIAM ROBERTS, as Administrator for the Estate of PAULINE ROBERTS, and<br>JENNIFER YORK, as Administrator *de bonis non* for the Estate of WILLIAM EARNEST ROBERTS,<br>    Plaintiffs,<br><br>v.<br><br>EDDIE GIRDER,[1] *et al.*,<br>    Defendant. | CIVIL NO. 6:15-CV-160-KKC<br><br><br>**OPINION AND ORDER** |

*** *** ***

This matter is before the Court on Motion for Summary Judgment filed by Defendants Somerset City Mayor Eddie R. Girdler, Somerset City Attorney Carrie D. Wiese, Somerset City Zoning Officer Dennis Crist, Somerset City Fire Department Chief Stephan Jasper, in their individual and official capacities, and Somerset City Building Inspector Wes Finley, in his official capacity, (DE 117). For the reasons set forth below, the Defendants motion for summary judgment is granted with respect to Plaintiffs' federal-law claims and this action is dismissed.

**I. Factual Background**

The following is an account of the undisputed facts in this action. Pauline Roberts died intestate on November 17, 1989. (Compl. ¶ 8.) At the time of her death, she lived with her son, William Roberts, in a house she owned at 117 Sagasser Street in Somerset, Kentucky.

---

[1] Somerset City Mayor Eddie Girdler's name is spelled incorrectly in the captain of Plaintiff's complaint. While the Court has previously noted this error, neither party has yet moved to correct it. (DE 41, 1 n.1.)

1

(Compl. ¶¶ 9, 17.) William Roberts continued to live in the house after her passing. (Compl. ¶ 21.)

Over the next 24 years, Robert's home fell into a state of disrepair and city officials began receiving complaints from the public about the property.[2] (DE 109-3, at 79–82.) During the summer of 2012, Somerset Police Captain Shannon Smith, at the request of City Zoning Officer Dennis Crist and Chief of Police Doug Nelson, took aerial photos of the property which revealed a tree growing from the interior of the home through the center of the roof, two holes in the roof, missing shingles, deteriorating roof joists, and moss covering the rear of the roof. (DE 117-3.)

Somerset Building Inspector Wes Finley also visited the property multiple times, sometimes communicating with Roberts and other times just observing the home from the street, and made a request for an abatement hearing. On May 3, 2013, the City initiated abatement proceedings. Somerset City Attorney Carrie Wiese mailed a certified letter to the 117 Sagasser Street, addressed to the Estate of Pauline Roberts, alleging that the property "appears to be unfit for human habitation, occupancy or use" and setting a nuisance abatement hearing for May 23, 2013. (DE 110-1, at 24.) Roberts signed a return receipt for the letter and hired an attorney, John Prather, Jr., to represent him at the hearing. (Compl. ¶ 26.) On May 16, 2013, Prather sent a letter to Wiese informing her that he was in the process of preparing a remediation plan for the property and requested to postpone the hearing due to a scheduling conflict. (Compl. ¶ 37; DE 1-5.) The city agreed to postpone the hearing, but no new date was set (Compl. ¶¶ 38–39.) Instead, Prather met informally with Wiese, Finley, and Crist at City Hall. (Compl. ¶¶ 44.) During the meeting, Finley presented his file containing pictures and notes on the property. (DE 109-3, at 37.) Prather

---

[2] Roberts expert witness states that Roberts admitted that his home "was in disrepair and potentially dangerous."(DE 113-2, at 7.)

acknowledged that the property had problems and claimed that he was going to submit a plan to correct them. (DE 109-3, at 62.)

Despite Prather's claim that a remediation plan would be implemented, no improvements or repairs were made to the property over the next fourteen months. On August 14, 2014, Crist sent Roberts a written notice advising him that, because the property remained a hazard and structurally unsafe for human habitation, he was ordered to repair or vacate the property within thirty days. The letter also informed Roberts that the City would offer him help in moving and storing his belongings, and would take care of the dilapidated structure, at no cost. (DE 1-7.)

Finley visited the property again on September 16, 2014, three days before the planned demolition, to urge him to submit a remediation plan to avoid the demolition. Finley also took photos from outside the residence. (109-3 at 58.) He observed and documented issues with the chimney, the hole in the roof, and non-level cabinets and house ridgeline, suggesting issues with structural integrity. (DE 109-3, at 69.) The visit, however, turned confrontational, although Finley did not feel directly threatened, and Roberts ordered him to leave the property. (DE 109-3, at 49–51.) Finley reported his interaction with Roberts, and the warning to leave the property, to Mayor Eddie Girdler and Chief Nelson.

On September 18, 2014, Chief Jasper, accompanied by other firefighters, went to Robert's property to offer him assistance with moving his belongings. Roberts denied the firefighters offer. While Roberts was non-threatening, one firefighter asked Roberts if he was carrying a pistol and Roberts briefly pulled the gun out of his right back pocket to display it. (DE 109-9, at 28–30.) Jasper reported the encounter to Chief Nelson. (DE 109-9, at 36.)

Jasper returned the next day accompanied by Mark Catron, another Somerset firefighter. Catron began to engage in small talk with Roberts and asked him why he changed his mind about vacating the property. The encounter quickly turned tense. According to Jasper,

3

Roberts told them that he intended to defend his property and that it would "not be good if you show up here, anybody that shows up here." Jasper also testified that Roberts talked about having news cameras and media at his property "because he's gonna go down in a blaze of glory if anybody shows up and somebody's gonna get hurt." Jasper also claimed that Roberts was laughing and crying and appeared to be in "complete mental distress" and "in the midst of a significant behavioral crisis." (DE 109-9, at 37–38.) Roberts admitted to his own expert witness that he made a statement to the effect of "this will not end well, it won't be pretty," but claims it was an attempt to "buy time," not a direct threat. (DE 113-2, at 4.)

Jasper became worried that, if city officials returned to the home for the planned demolition, either they or Roberts might be killed. (DE 109-9, at 38.) Jasper went to City Hall to inform other officials of his public safety concerns. A meeting took place in the City Council chambers, during which Mayor Girdler, Wiese, Chief Jasper, Catron, and four police captains were present.[3] (DE 109-9, at 44–46.) The meeting was recorded by Captain Smith. (DE 109-15, at 8, 26.) During the meeting, Wiese stated that she intended to go to County Attorney Martin Hatfield and seek either a mental health warrant or a terroristic threatening warrant. (DE 109-15, at 129.) When the group arrived at the County Attorney's office, Wiese met with a female attorney from the office who recommended that Wiese go to the sheriff's office to obtain a warrant. (DE 109-9, at 50–52.)

At the sheriff's office, Wiese, Jasper, and Catron met with Detective John Hutchinson. (DE 109-9, at 54.) Jasper recounted to Detective Hutchinson his interactions with Roberts and told him that he believed that Roberts posed a real threat if the city attempted to demolish his house. (DE 109-9, at 54.) Wiese also showed Detective Hutchinson two photos

---

[3] The police captains present were Shannon Smith, Randy Goff, William Hunt, and Jeff Philippe. Also present was Tarna Wood. (DE 109-15, at 88.)

4

of the home: one of a chest of drawers showing the condition of the inside of the home and a dead cat and the second an aerial shot showing the hole in the roof. (109-2, at 97.) Detective Hutchinson then drafted and signed a criminal complaint stating that Roberts had:

> Committed the offense of Menacing and Obstructing Governmental Operations by intentionally placing officials of the Somerset Fire Department, Somerset Police Department and Code Enforcement Officers in reasonable apprehension of imminent physical injury and intentionally obstructing the performance of a governmental function (nuisance abatement order) by making threats of physical violence towards anyone trying to remove him from his residence. . . . Members of the local fire departments, members of the local police department and the Code Enforcement Officer were present at [Robert's] residence as part of their official capacity and ask [sic] him to leave. [Robert's] said that he needed two weeks to leave and if anyone showed up tomorrow "it" would not be pretty and he would probably end of [sic] being shot because he will protect his house and it would be on the national news.

(DE 1-14.)

A petition for involuntary hospitalization[4] was also completed. The petition was signed by Jasper, who dictated its contents. (DE 109-9, at 82–83.) In the petition, Jasper averred that he believed Roberts had a mental illness because:

> [Roberts] refuses to leave a condemned property that is an imminent danger to himself, emergency services, or/and the public at large. [Roberts] is carrying a concealed weapon & indicated that if city officials and/or law enforcement attempted to remove him, he would "get shot and it wouldn't be pretty and it would be on the local & national news."

(DE 110-1, at 82.)

He also stated that he believed Roberts to be a danger or threat of danger to self, family or others because he was "unstable emotionally & physically, repeated threatening statements to city officials, specifically the Somerset Fire Chief & Somerset Battalion Chief." (DE 110-1, at 82.)

The warrants were submitted to Pulaski District Court Chief Judge Jeffery Scott Lawless. Before approving the warrant and mental health petition, Judge Lawless called Detective

---

[4] Commonly referred to as a "mental health petition" or "mental health warrant."

5

Hutchinson's office and asked whether the complaint should say "court order" or "abatement order." Wiese took the phone and told him that it should say abatement order and explained to him an abatement order is issued by the city, not a judge, and gives a resident 30 days to vacate a property. (109-2, at 99.) Judge Lawless then signed both the arrest warrant and mental health petition.

Chief Nelson, and his command staff, Captains Goff, Phillippi, Hunt, and Correll, went to arrest Roberts based on the warrant. Chief Nelson anticipated a volatile situation but, when he arrived, Roberts was sitting in his vehicle. Chief Nelson was able to grab him, put him in a wrist lock to prevent him from getting his gun, and place him in custody. (DE 109-11, at 71–72.) Roberts was taken to a psychiatric facility where he was evaluated and released; he was then immediately taken to jail on the arrest warrant. (Compl. ¶¶ 111–113.)

While Roberts was in jail, the demolition process on his home began. Finley completed a walkthrough of the home prior to the demolition in order to remove any valuable items belonging to Roberts. (DE 109-3, at 64–65.) After observing the state of the chimney, however, Finley instructed members of the City Sanitation Department who were present not to enter the house because of the risk of collapse. Instead, he removed any accessible items himself. (DE 109-3, at 65.) Finley fell through the floor while walking through the home and stepped in human defecation; Roberts had been using a bucket for a toilet and throwing the use bags into a corner. (DE 109-3, at 66.) After stepping in the defecation, Finley was forced to work in a protective Tyvek suit. (DE 109-3, at 63–64.) Finley also observed an emaciated cat and described the odor of the resident as being like a "dumpster" or "decomposition." (DE 109-3, at 56.) Finley removed a number of guns from the property and gave them to police. (DE 109-3, at 65–68.) Chief Jasper also entered the home and observed holes in the floor and roof. He described the home as the "worst conditions [he'd] ever seen a human being live in" in his seven years as of emergency medical services. (DE 109-9, at 94.) The home was demolished

later that day. Roberts was released from jail two days later after bond was posted on his behalf. The charges against him were eventually dropped.

## II. Procedural Background

This action was originally brought by William Roberts, individually, and as administrator of the Estate of Pauline Roberts. Previously, Defendants Crist, Finley, Girdler, Jasper, and Wiese, both in their official and individual capacity, (collectively, the "City Defendants"), filed a motion to dismiss Plaintiffs procedural due process claim. (DE 17.) Specifically, Plaintiffs argued that the abatement notices and informal meeting did not provide adequate notice or opportunity to be heard. Plaintiffs also filed a motion to substitute Rachelle Bombe, Polly Williams, and William Roberts for the Estate of Pauline Roberts. (DE 22.) While those motions were pending, William Roberts passed away and Plaintiffs moved to substitute his estate in his place.[5] (DE 35.)

The Court issued an Opinion and Order addressing those motions, holding that Plaintiffs had not demonstrated that they received constitutionally inadequate due process. Accordingly, Count I and Count V-VIII, to the extent they were predicated on procedural due process, were dismissed. The Court denied Plaintiff's motion to substitute Bombe, Willman, and Roberts in place of the Estate of Pauline Roberts. And, lastly, the Court determined that Count IV for malicious prosecution, Count XII for defamation, Count XIII for malicious prosecution, and Count XIV for invasion of privacy, did not survive Roberts's death. *See Roberts v. Girder*, 237 F. Supp. 3d 548 (E.D. Ky. 2017).

The Defendants filed three motions for summary judgment. The first was filed by Detective Hutchinson. (DE 113.) Finley filed a motion for summary judgment in his

---

[5] The original administrator of William Robert's estate, Polly William, has also passed away during the course of this litigation. Jennifer York was substituted as the administrator *de bonis non* for his estate after Polly William's death. (DE 100.)

individual capacity. (DE 115.) And the City Defendants, in their official and, with the exception of Finley, individual capacities, also filed a motion for summary judgment. (DE 117.) Hutchinson and Finley, in his individual capacity only, have since settled their claims and withdrawn their motions for summary judgment. (DE 158; DE 160.) Replies and responses to the City Defendants motion have been filed and this matter is now ripe for review.

### III. Standard of Review

A moving party is entitled to summary judgment pursuant to Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment must be entered if, "after adequate opportunity for discovery," a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 940 (6th Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted)).

The initial burden is on the moving party. *Cox v. Ky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). To meet its burden, "the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the jury."[6] 53 F.3d at 149.

Once the moving party satisfies its burden, "the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Id.* at 150. To carry this burden, "[t]he nonmoving party must provide more than

---

[6] Those sources include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" in the record. Fed R. Civ. P. 56(c)(1)(A).

8

a scintilla of evidence," or, in other words, "sufficient evidence to permit a reasonable jury to find in that party's favor." *Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

**IV. Analysis**

There are nine claims still pending before the Court. First, Counts II–III allege that the Defendant deprived Roberts of his Fourth Amendment rights, in violation of 42 U.S.C. § 1983, by making false statements to obtain a mental health petition and arrest warrant without probable cause. Second, Counts V–VIII allege that the Defendants engaged in a civil conspiracy by doing the same. Finally, Plaintiffs have three remaining state tort claims: abuse of process (Count IX), false imprisonment (Count X), and intentional infliction of emotional distress (Count XI).

*A. Unlawful arrest claims*

The Defendants argue that they are entitled to qualified immunity for Plaintiff's unlawful arrest claims because the arrest was based on probable cause. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 231, 229 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* To determine if a defendant is entitled to qualified immunity, the Court must ask "(1) whether the facts alleged by the plaintiff make out the violation of a constitutional right and (2) whether the right at issue was 'clearly established' at the time of the alleged violation." *Id.* at 232. The burden is on the plaintiff to show that

both prongs are met and that the defendants are not entitled to qualified immunity. *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010).

To state a claim for unlawful arrest, "a plaintiff must prove that the arresting officer lacked probable cause to arrest the plaintiff." *Robertson v. Lucas*, 753 F.3d 606, 618 (6th Cir. 2014) (quoting *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)). "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Logdsdon v. Hains*, 492 F.3d 334, 341 (2007) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). Generally, it is a complete defense to a constitutional claim of unlawful arrest that the arrest was made pursuant to a facially valid warrant. *Robertson*, 753 F.3d at 618 (quoting *Voyticky*, 412 F.3d at 677). Only where a "warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986) (internal citations omitted) (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)). A warrant is not sufficient to avoid summary judgment, however, "when evidence exists that a defendant intentionally mislead or intentionally omitted information at a probable cause hearing for an arrest or a search warrant provided that the misleading or omitted information is critical to the finding of probable cause." *Voyticky*, 412 F.3d at 677 n.4 (citing *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998); *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997)). The plaintiff must therefore establish "(1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the fining of probable cause." *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003). Thus, if "the judge would have issued the warrant whether or not there had been false testimony," the defendants are entitled to qualified immunity. *Id.* at 518.

1. *Mental Health Petition*

Kentucky permits any "interested person" to file a petition for involuntary hospitalization. Ky. Rev. Stat. § 202A.051(3). A Kentucky district court may, after reviewing the petition and determining that there is probable cause to believe that the individual should be involuntarily hospitalized, order the individual to be examined by a mental health professional. The court may also order a sheriff or other peace officer to transport the individual to the psychiatric facility for examination. *Id.* at § 202A.051(6).

The mental health petition, submitted by Jasper, alleged that Roberts refused to leave his home, despite it being an imminent danger to himself; was carrying a concealed weapon; and had indicated that, if City officials attempted to remove him, he would get shot and make the news. It further stated that Roberts was a danger to himself and others because he was emotionally unstable and had made repeated threatening statements to City officials. (DE 110-1, at 82.) These allegations were sufficient to support a finding of probable cause that Roberts should have been involuntarily hospitalized.

Plaintiffs allege that Jasper's petition contained false statements which must be excluded, destroying probable cause. Plaintiff, however, has failed to prove that most of these statements were false. First, Plaintiffs claim that Jasper denied making the statement that Roberts told Jasper that he owned several firearms. Jasper, however, knew that Roberts owned firearms based on statements made to several Somerset firefighters. (DE 109-9, at 79.) Next, Plaintiffs claim that Jasper made false statements about the home being condemned and becoming an "immediate danger." But Jasper testified that Wiese had told him the home had been condemned and posed an imminent danger to Roberts, emergency services, and others. Jasper also testified that he drove by the house and his observation confirmed Wiese's claim. (DE 109-9, at 79.) Plaintiffs appear to argue that the statement is false because the home had not *suddenly* become an imminent danger, but the mental health

11

petition does not contain any such statement. The petition merely states that the property is an "imminent danger." It says not nothing about whether the danger suddenly occurred or was an ongoing condition.

Jasper did admit that two statements were not written by him. First, Jasper testified that he did not write and could not say whether the statement that Roberts had made threatening statements to "other city officials" was accurate. (DE 109-9, at 84.) Second, Jasper also admitted that he did not write the statement Roberts had short term memory loss and could not recall conversations with city officials and clergy. (DE 109-9, at 86–87.) Accordingly, these statements must be excluded in determining whether probable cause existed.

Even excluding those statements, however, probable cause existed. Plaintiffs cannot plausibly deny that Roberts made statements to Jasper and Catron leading Jasper to believe he was a threat to himself and others. Jasper testified that Roberts told him that he would get shot if City officials attempted to remove him from the property. (DE 109-9, at 82.) Catron stated, in an affidavit, that Roberts laughed and cried during the conversation, acted abnormally compared to prior interactions, and stated that he would protect his property if "anyone ever 'kicked down' his door and tried to take it away from him." And, most notably, Roberts admitted to his own expert witness, psychologist Dr. Wayne Herner, that his statement "[t]his will not end well, it won't be pretty," made in an attempt to "buy time," was the basis for the mental health petition. (DE 113-2, at 4.) That statement alone, which Roberts admitted to making, was enough to constitute probable cause that Roberts posed a threat to himself and others.

Plaintiffs also argue that Jasper was not an authorized person to submit an involuntary health petition for Roberts. But the statute permits any "interested person" to file a petition. Ky. Rev. Stat. § 202A.051(3). Plaintiffs claim that Jasper was not an interested person because he went to Robert's property on his own accord, not in his official capacity as Fire

12

Chief. That argument is unavailing; Jasper's presence when the statements were made by Roberts made him an "interested person" within the plain meaning of that term.

2. *Arrest Warrant*

The arrest warrant alleged that Roberts committed the crimes of menacing and obstructing governmental operations. The offense of obstructing governmental operations occurs "when he intentionally obstructs, impairs or hinders the performance of a governmental function by using or threatening to use violence, force or physical interference." Ky. Rev. Stat. § 519.020(1). Detective Hutchinson had probable cause that Roberts made a threat of violence intended to obstruct the City's lawful demolition of his home based on Jasper's reporting of that statement to him.

Plaintiffs argue that two of the statutes enumerated exceptions apply and destroy probable cause. These arguments are unavailing. The first exception states that the statute does not apply to "[a]ny means of avoiding compliance with the law without affirmative interference with governmental functions." *Id.* § 519.020(2)(a). Plaintiffs argue that Robert's refusal to voluntarily vacate his property was not an "affirmative interference." No court has addressed the meaning of "affirmative interference" in the statute. Robert's argues that he did not engage in "affirmative interference" by merely refusing to voluntarily vacate his property. Roberts, however, was not accused of interfering with government operations for merely refusing to vacate his property; his violation of the statute was premised on his threats of physical violence towards anyone trying to remove him from the property. While merely refusing to vacate may not have been an affirmative interference, Robert's threatening statements were. Thus, the first exception does not apply.

The second exception applies if the obstruction is of an "unlawful action by a public servant." *Id.* § 519.020(2)(b). Plaintiff's claim that the City was engaged in an unlawful

13

attempt to remove him from his home because they failed to comply with Somerset City Ordinance 650 §3(c), which provides:

> If the public officer determines that an immediate danger exists and that action should be taken before a hearing can be held, he may notify the utilities companies not to turn on any services to said building or to disconnect same and may post the premises so as to prevent the occupancy of same until a hearing is held pursuant to the provisions thereof.

Section 3(c), however, does not require that the City "post the premises;" it merely permits the City to do so to prevent occupancy until a hearing is held. In Robert's case, the City conducted an informal nuisance abatement hearing, which the Court has previously determined provided Robert's due process.[7] Thus, the City's plan to demolish the home was lawful. Moreover, the City had the authority, pursuant to Ky Rev. Stat. § 65.8838, to take "immediate action to remedy a violation of its ordinance when there is reason to believe that the existence of the violation presents a serious threat to the public health, safety, and welfare." Accordingly, it was lawful for the City to proceed with the demolition of Robert's home without obtaining an eviction order or posting the premises.

The Defendants do not argue that there was probable cause for the offense of menacing. But, even if the warrant lacked probable cause that Roberts committed menacing, the warrant was valid because there was probable cause that Roberts obstructed governmental operations. *See Voyticky*, 412 F.3d at 676 ("We have held that where no probable cause exists to arrest a plaintiff for a particular crime, but that probable cause exists to arrest that plaintiff for a related offense, the plaintiff cannot prevail in a suit alleging wrongful arrest brought pursuant to 42 U.S.C. § 1983." (citing

---

[7] Plaintiffs argue that there is a genuine dispute as to a material fact because the City relied, in part, on the consent of Robert's attorney, John Prather, to carry out the plan to demolish the home. Plaintiffs argue that Prather was no longer representing Roberts at that time. But when Prather was subpoenaed in this matter, Plaintiffs' counsel directed him to invoke the attorney client privilege to prevent disclosure of documents generated in September 2014. Additionally, the City's plan to demolish the home was lawful regardless of Robert's consent based on the nuisance abatement proceedings.

*Avery v. King*, 110 F.3d 12, 14 (6th Cir. 1997)). Thus, the Defendants are entitled to summary judgment on Plaintiffs' unlawful arrest claims.

B. *Official capacity and civil conspiracy claims*

A § 1983 claim against City officials in their official capacities is equivalent to a claim against the City itself. *See Laubis v. Witt*, 597 F. App'x 827, 832 (6th Cir. 2015). In order for a local government to be liable under § 1983, the plaintiff must prove that the underlying constitutional violation was the result of an official government policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

A civil conspiracy under § 1983 exists when two or more persons enter into an agreement to injury another by unlawful action. *Robertson*, 753 F.3d at 622 (quoting *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). To prevail on a civil conspiracy claim, the plaintiff must show "that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed" in furtherance of the conspiracy that caused the injury." *Id.* (quoting *Revis*, 489 F.3d at 290.).

Plaintiffs *Monell* claims against the Defendants in their official capacity and their civil conspiracy claims both fail for the same reason: as explained above, there was no underlying constitutional violation because Plaintiffs arrest was based on probable cause. Accordingly, the Defendants are entitled to summary judgment on these claims.

C. *State law claims*

Having found that the City Defendants are entitled to summary judgment on Plaintiffs' federal-law claims, and having received notices of settlement from Defendants Hutchinson and Finley, the Court must determine whether to retain jurisdiction over the remaining state-law claims asserted against the City Defendants. Federal district courts

have supplemental jurisdiction over pendent state law claims pursuant to 28 U.S.C. § 1367. Generally, "district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." *Id.* at § 1367(c)(3). In deciding whether to exercise this discretion, the court should consider "the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Ordinarily, when all federal-law claims have been dismissed before trial, a federal court should not reach plaintiffs' state-law claim. *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006). Instead, "[r]esidual jurisdiction should be exercised only in cases where the 'interests of judicial economy and the avoidance of multiplicity of litigation' outweigh our concern over 'needlessly deciding state law issues.'" *Id.* (quoting *Landefeld v. Marion Gen Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). This is not such a case and therefore Plaintiffs' state law claims are dismissed without prejudice.

V. **Conclusion**

For the reasons set forth above, the Court **HEREBY ORDERS**:

(1) all claims against Defendants Pulaski County Sheriff's Office Detective John Hutchinson and Wes Finely, in his individual capacity are **DISMISSED** pursuant to Defendants' Notice of Settlement (DE 158; DE 160). Plaintiffs may refile their claims against Defendants Hutchinson and Finley within thirty days if the settlement is withdrawn;

(2) Defendants Somerset City Mayor Eddie R. Girdler, Somerset City Attorney Carrie D. Wiese, Somerset City Zoning Officer Dennis Crist, Somerset City Fire Department Chief Stephan Jasper, in their individual and official capacities, and Somerset City Building Inspector Wes Finley, in his official capacity Motion for

16

Summary Judgment is **GRANTED** with respect to Plaintiffs' remaining federal-law claims;

(3) Plaintiffs' state-law claims against Defendants Somerset City Mayor Eddie R. Girdler, Somerset City Attorney Carrie D. Wiese, Somerset City Zoning Officer Dennis Crist, Somerset City Fire Department Chief Stephan Jasper, in their individual and official capacities, and Somerset City Building Inspector Wes Finley, in his official capacity are **DISMISSED**;

(4) all remaining motions are **DENIED** as moot;

(5) the pre-trial conference set for July 25, 2018 and trial set for August 20, 2018 are **SET ASIDE**;

(6) a Judgment consistent with this Order will be entered contemporaneously.

Dated July 23, 2018.

*Karen K. Caldwell*
KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY